

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-23-1999

# Doby v. DeCrescenzo

Precedential or Non-Precedential:

Docket 98-1124

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Doby v. DeCrescenzo" (1999). *1999 Decisions.* Paper 74.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/74

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 22, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-1124 and 98-1224

REBECCA S. DOBY; HERBERT K. DOBY,
       Appellants in No. 98-1124

v.

JAMES DECRESCENZO; BUCKS COUNTY DEPARTMENT
OF MENTAL HEALTH AND MENTAL RETARDATION;
PHILLIP M. FENSTER, COUNTY ADMINISTRATOR, BUCKS
COUNTY DEPARTMENT OF MENTAL HEALTH AND
MENTAL RETARDATION, in his official capacity; AMY
BRYANT, individually and in her official capacity as
Delegate for the County Administrator of the Bucks
County Department of Mental Health/Mental Retardation
Lenape Valley Foundation; DEBBIE NEIDHARDT,
individually and in her official capacity as Delegate for the
County Administrator of the Bucks County Department of
Mental Health and Mental Retardation; TOWNSHIP OF
WARRINGTON; WARRINGTON TOWNSHIP POLICE
DEPARTMENT; JOHN BONARGO, CHIEF OF POLICE,
WARRINGTON TOWNSHIP POLICE DEPARTMENT, in his
official capacity; JOHN DOE, POLICE OFFICER #1, Officer
who, with police officer #2, asked Mrs. Doby to step
outside apartment at approximately 7:00 p.m. and took
Mrs. Doby in handcuffs and shackles to the hospital,
individually and in his official capacity as police officer of
Warrington Township; JOHN DOE, POLICE OFFICER #2,
Officer who, with police officer #1, asked Mrs. Doby to
step outside apartment at approximately 7:00 p.m. and
took Mrs. Doby in handcuffs and shackles to the hospital,
individually and in his official capacity as police officer of
Warrington Township; JOHN DOE, POLICE OFFICER #3,
Officer who came to the Dobys' apartment at
approximately 7:00 p.m. on December 30, 1993, and
remained at their apartment after Mrs. Doby was taken to

the hospital, individually and in his official capacity as police officer of Warrington Township; LENAPE VALLEY FOUNDATION; JOHN C. RICHARDS, M.D.; DOYLESTOWN HOSPITAL; JOSEPH KNOX, SERGEANT, of the Warrington Township Police Department, in his official and individual capacity; MICHAEL NEIPP, OFFICER, of the Warrington Township Police Department, in his official and individual capacity; KENNETH HAWTHORN, OFFICER, of the Warrington Township Police Department, in his official and individual capacity

REBECCA S. DOBY;

HERBERT K. DOBY,
        Appellants in No. 98-1224

v.

JAMES DECRESCENZO; BUCKS COUNTY DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION; PHILLIP M. FENSTER, COUNTY ADMINISTRATOR, BUCKS COUNTY DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION, in his official capacity; AMY BRYANT, individually and in her official capacity as Delegate for the County Administrator of the Bucks County Department of Mental Health/Mental Retardation Lenape Valley Foundation; DEBBIE NEIDHARDT, individually and in her official capacity as Delegate for the County Administrator of the Bucks County Department of Mental Health and Mental Retardation; TOWNSHIP OF WARRINGTON; WARRINGTON TOWNSHIP POLICE DEPARTMENT; JOHN BONARGO, CHIEF OF POLICE, WARRINGTON TOWNSHIP POLICE DEPARTMENT, in his official capacity; JOHN DOE, POLICE OFFICER #1, Officer who, with police officer #2, asked Mrs. Doby to step outside apartment at approximately 7:00 p.m. and took Mrs. Doby in handcuffs and shackles to the hospital, individually and in his official capacity as police officer of Warrington Township; JOHN DOE, POLICE OFFICER #2, Officer who, with police officer #1, asked Mrs. Doby to step outside apartment at approximately 7:00 p.m. and took Mrs. Doby in handcuffs and shackles to the hospital, individually and in his official capacity as police officer of Warrington Township; JOHN DOE, POLICE OFFICER #3,

2

Officer who came to the Dobys' apartment at
approximately 7:00 p.m. on December 30, 1993, and
remained at their apartment after Mrs. Doby was taken to
the hospital, individually and in his official capacity as
police officer of Warrington Township; LENAPE VALLEY
FOUNDATION; JOHN C. RICHARDS, M.D.; DOYLESTOWN
HOSPITAL; JOSEPH KNOX, SERGEANT, of the Warrington
Township Police Department, in his official and individual
capacity; MICHAEL NEIPP, OFFICER, of the Warrington
Township Police Department, in his official and individual
capacity; KENNETH HAWTHORN, OFFICER, of the
Warrington Township Police Department, in his official
and individual capacity

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 94-03991)
District Judge: Honorable John P. Fullam

Argued February 16, 1999

BEFORE: GREENBERG, ROTH, and LOURIE,*
Circuit Judges

(Opinion filed: March 22, 1999)

      Timothy I. McCann (argued)
      Linda A. Carpenter
      McCann & Geschke
      1819 John F. Kennedy Boulevard
      Suite 330
      Philadelphia, PA 19103

      Attorneys for appellants
_____

* Honorable Alan D. Lourie, Circuit Judge of the United States Court
of Appeals for the Federal Circuit, sitting by designation.

Joseph Goldberg (argued)
Peggy B. Greenfeld
Tracy A. Walsh
Margolis Edelstein
Sixth and Walnut Streets
The Curtis Center, 4th Floor
Philadelphia, PA 19106

Attorneys for appellee James
Decrescenzo

Sean X. Kelly (argued)
Marks, O'Neill, Reilly, O'Brien
 & Courtney
216 Haddon Avenue
Suite 500
Westmont, NJ 08108

Attorneys for appellees Bucks
County Department of Mental
Health and Mental Retardation,
Phillip M. Fenster, County
Administrator, Bucks County
Department of Mental Health And
Mental Retardation, in his official
capacity and Debbie Neidhardt,
individually and in her official
capacity as Delegate for the
County Administrator of the Bucks
County Department of Mental
Health and Mental Retardation and
Township of Warrington

4

Barbara S. Magen (argued)
Donald N. Camhi
Amalia V. Romanowicz
Post & Schell
1800 JFK Boulevard
19th Floor
Philadelphia, PA 19103

Attorneys for appellees Amy
Bryant, individually and in her
official capacity as Delegate for the
County Administrator of the Bucks
County Department of Mental
Health/Mental Retardation Lenape
Valley Foundation and Lenape
Valley Foundation

L. Rostaing Tharaud (argued)
Marshall, Dennehey, Warner,
Coleman & Goggin
1845 Walnut Street
Philadelphia, PA 19103

Attorneys for appellees Warrington
Township Police Department, John
Bonargo, Chief of Police,
Warrington Township Police
Department, in his official capacity,
Joseph Knox, Sergeant, Warrington
Township Police Department, in his
official and individual capacity,
Michael Neipp, Officer, of the
Warrington Township Police
Department, in his official and
individual capacity, and Kenneth
Hawthorn, Officer, Warrington
Township Police Department, in his
official and individual capacity

5

Alan S. Gold (argued)
Monaghan & Gold
7837 Old York Road
Elkins Park, PA 19027

Attorneys for appellee John C.
Richards, M.D.

Marion H. Griffin (argued)
Marshall, Dennehey, Warner,
Coleman & Goggin
1845 Walnut Street
Philadelphia, PA 19103

Attorneys for appellee Doylestown
Hospital

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

Believing that his employee Rebecca Doby was suicidal, James DeCrescenzo filed a petition with the Bucks County Department of Mental Health to have her examined involuntarily under section 7302 of the Pennsylvania Mental Health Procedures Act. The appropriate county official granted the petition and issued a warrant instructing the local police to bring Doby to a nearby hospital for a psychiatric evaluation; this evaluation led to her involuntary five-day commitment. Claiming that her federal rights to due process and freedom from unreasonable searches and seizures had been violated, Doby and her husband, Herbert Doby, brought suit under 42 U.S.C. S 1983 against the individuals involved in her commitment, including DeCrescenzo, the county, certain of its officials, the police officers who executed the warrant, and an evaluating doctor. The district court dismissed portions of the Dobys' case, entered judgment as a matter of law for the defendants before or at the trial on other claims, and subsequently denied the Dobys' post-trial

motions for a new trial and for other relief. The Dobys appeal, arguing primarily that Bucks County relies upon an unconstitutional policy in processing petitions for involuntary examinations. After evaluation of the many issues involved in this case we have concluded that the county's policy in enforcing the Mental Health Procedures Act is constitutional, and that there is no other reason to reverse the orders or judgments on appeal. Consequently, we will affirm.

II. JURISDICTION

The district court had jurisdiction over the Dobys' section 1983 claims under 28 U.S.C. SS 1331 and 1343 and supplemental jurisdiction over their related state law claims under 28 U.S.C. S 1367. Because the Dobys appeal from final orders of the district court, we have jurisdiction under 28 U.S.C. S 1291.

III. FACTUAL AND PROCEDURAL HISTORY

A. Factual History

The chain of events at the center of this appeal commenced when Doby handed a letter to DeCrescenzo on December 22, 1993. At the time, Doby had worked for DeCrescenzo's court reporting agency for two years. She alleges that during her employment her relationship with DeCrescenzo had become intimate and included several instances of sexual contact but not sexual intercourse. DeCrescenzo denies that his relationship with Doby extended beyond friendship.

The letter in question was lengthy, 11 pages in total, and personal. It referred to abuse suffered by Doby during her childhood and described sexual conduct in which Doby wished to engage with DeCrescenzo. At the letter's conclusion, Doby also wrote that she had accomplished what she was intended to do in this lifetime and was "leaving." Alarmed by the letter's contents, DeCrescenzo consulted with his wife, his marriage counselor, and his attorney. Dr. Linda Edelstein, his marriage counselor, advised him that the letter's author was in psychiatric

distress, potentially suicidal, and needed the immediate assistance of mental health professionals. On her advice, DeCrescenzo spoke with personnel of the Philadelphia mental health office who suggested that they could send a mobile emergency crisis team to meet with Doby. Without consulting Doby, DeCrescenzo arranged for the crisis team to come to his office on December 30, 1993.

However, on December 30, Doby left the office before the mobile emergency crisis team arrived. From her car phone, she placed a call to a co-worker, Kathy McHugh, to advise her that she would not attend McHugh's New Year's Eve party. Doby was upset and crying, indicated that she was driving in the rain, and would not tell McHugh where she was going. McHugh reported this conversation to DeCrescenzo who then called Doby to ask her to return to the office. Doby refused and indicated that she did not want to speak to him.

DeCrescenzo then called the Philadelphia mental health office and the Warrington Township police. At the suggestion of the mental health office, he also contacted Herbert Doby and read to him several phrases from Doby's letter. Concerned for his wife, Herbert Doby called her on the car phone but their conversation convinced him that nothing was wrong. Doby then phoned DeCrescenzo to assure him that she was not in danger.

Unsure of what to do next, DeCrescenzo again phoned the Warrington Township Police Department. At their suggestion, DeCrescenzo asked his wife and Kathy McHugh to search Doby's work area for other indications of her mental state. This search revealed a suicide note Doby authored, which begins "If you are receiving this letter it is because I am gone, and I seek your help for Herb and my girls." The search also uncovered written reminders to make arrangements for organ donation and the custody of Doby's daughter and step-daughter. The defendants claim that DeCrescenzo brought these writings when he later applied for a warrant to have Doby involuntarily examined on an emergency basis.

After discovering the suicide note, DeCrescenzo went to the Doylestown Hospital to petition to have Doby

8

involuntarily examined according to the guidelines of the Pennsylvania Mental Health Procedures Act ("MHPA"), Pa. Stat. Ann. tit. 50, S 7101 et seq. (West Supp. 1998). During his drive to the hospital, he received another call from Herbert Doby informing him that Doby was fine.

Section 7302 of the MHPA permits the issuance of a warrant for an involuntary emergency examination. It states:

> Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such a person to the facility specified in the warrant.

Pa. Stat. Ann. tit. 50, S7302(a)(1). According to the statute a person may be "severely mentally disabled" if he or she "poses a clear and present danger of harm to others or to [himself/herself.]" Pa. Stat. Ann. tit. 50,S7301(a). In turn, clear and present danger is shown if "within the past 30 days . . . the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide." Pa. Stat. Ann. tit. 50 S7301(b)(2)(ii). The statute also provides that a physician must examine a person brought in under a section 7302 warrant within two hours of her arrival at the facility. Pa. Stat. Ann. tit. 50, S 7302(b). If the physician performing the involuntary examination determines that the individual is severely mentally disabled and in need of immediate treatment, the individual may be involuntarily committed to begin treatment for a period not to exceed 120 hours. The period of commitment, however, may be extended in certain circumstances. Pa. Stat. Ann. tit. 50 S 7302(b).

Upon reaching the hospital, DeCrescenzo met with Amy Bryant, a crisis worker for Lenape Valley Foundation ("LVF"), which processes petitions for involuntary examinations for Bucks County. In his discussion with Bryant, DeCrescenzo presented her with an undated copy of the 11-page letter and stated that he had found a suicide

note that day on Doby's desk. Bryant's recorded the information provided by DeCrescenzo on the section 7302 application:

> I believe that Rebecca Doby is in need of emergency psychiatric care. Today I found an extensive suicide note on her desk, as well as lists of chores including transferences of information to her husband about access to bank accounts, insurance policy bills, a shared storage shed, and her current status with my company. She also has written a reminder to call about organ donations. Rebecca asked me as well to lock away a file for her with a note attached instructing me to destroy it if anything should happen to her. She also has begun letters to friends and relatives, with envelopes already addressed, asking either for forgiveness for pain she caused or including pleas for their help with the raising of her children. The return address is to a P.O. Box which only lists the names of her husband and children. In the past few weeks Rebecca has been drastically less efficient at work and often retires to a cot to sleep during working hours. She has access to guns and has a license to carry one herself; she also talks a great deal about guns. I truly fear for her safety.

DeCrescenzo did not recount the events of the day specifically, nor did he relate the Dobys' repeated claims that day that Doby was not in danger. After recording DeCrescenzo's application, Bryant consulted by telephone with Debbie Neidhardt of the Bucks County Department of Mental Health and Mental Retardation. During this conversation, Bryant read the section 7302 application to Neidhardt and, as required by section 7102 of the MHPA, inquired whether involuntary emergency treatment was the least restrictive alternative available.[1] After a 14-minute discussion, Neidhardt authorized the issuance of a section 7302 warrant for Doby's examination.[2] Bryant then signed

_____

1. Section 7102 of the MHPA provides: "Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed." Pa. Stat. Ann. tit. 50, S7102.

2. Although the Dobys argued that neither Bryant nor Neidhardt could have seen the suicide note because it was not part of the hospital's file

the warrant on Neidhardt's behalf, and DeCrescenzo delivered it to the Warrington Township Police Department.

Three police officers, Joseph Knox, Michael Neipp and Kenneth Hawthorn, arrived at the Dobys' apartment at approximately 7:00 p.m. to execute the warrant. After Doby answered their knock, they asked her to step outside. The parties disagree on whether the officers then explained to her why they were taking her into custody.

After Doby refused to accompany the officers and attempted to reenter the apartment to speak to her husband, the officers "grabbed" her. When she began to kick at the apartment door, they handcuffed her, and after she continued to resist forcefully, they shackled her and carried her to the police car. One officer, Hawthorn, stayed behind to speak with Herbert Doby. After he left the apartment, he entered the police car and drove Doby to Doylestown Hospital.

At the hospital, Dr. John Richards examined Doby. During the examination, they discussed the 11-page letter and Doby's feelings towards DeCrescenzo. Doby admitted to Dr. Richards that she had been depressed most of her life but claimed that she functioned very well. She also told him that she had been seeing a psychiatrist who had prescribed Prozac to treat her depression, but that she recently had stopped taking the medication. When Dr. Richards asked Doby whether she needed help, she admitted that she did but refused voluntary treatment. The examination ended when Doby asked to phone her husband and her psychiatrist and Dr. Richards agreed. Dr. Richards involuntarily committed Doby for a period not to exceed 120 hours.

On the following day, another physician, who is not a defendant in this suit, examined Doby, concluded that she was mentally disabled, and thus decided not to release her.

_____

on Doby, the district court noted that Neidhardt's deposition testimony contradicted this assertion. Neidhardt testified that she remembered hearing specific provisions of the two-page note during her conversation with Bryant.

11

On January 3, 1994, Doby signed voluntary commitment papers on the understanding that doing so would lead to her release on the following day. Doby was in fact released on January 4, 1994.

Claiming that the involuntary commitment violated their rights under federal and state law, the Dobys filed this action in June 1994 against DeCrescenzo, the Lenape Valley Foundation and Amy Bryant, the Bucks County Department of Mental Health and Mental Retardation, Philip M. Fenster, the county administrator, and Debbie Neidhardt, the Township of Warrington, the Warrington Township Police Department, Chief John Bonargo, Sergeant Joseph Knox, Officer Michael Neipp, and Officer Kenneth Hawthorn, Dr. John C. Richards, and Doylestown Hospital.

B. Procedural History

In their complaint, the Dobys alleged a violation of their civil rights under section 1983, false arrest and imprisonment, assault and battery, conspiracy, gross negligence, intentional infliction of emotional distress, and loss of consortium against all the defendants and sought a declaratory judgment that section 7302(a)(1) is unconstitutional. Additionally, they pled an invasion of privacy claim against DeCrescenzo, the county defendants, the foundation defendants, and the police defendants. Finally, the Dobys alleged defamation and wrongful use of civil proceedings against DeCrescenzo.

In an order of June 27, 1995, the district court, by Judge Rendell, dismissed the section 1983 claim against Dr. Richards and the conspiracy claims against all the defendants. Then, following extensive discovery, the parties cross-moved for summary judgment, and the district court, again by Judge Rendell, addressed their claims in a memorandum opinion and order dated September 9, 1996. The court dismissed claims against the foundation defendants, the county defendants, Doylestown Hospital, and Dr. Richards. The court also denied the Dobys' motion for summary judgment, which requested a ruling that the municipal defendants and individual defendants sued in their official capacity were liable as a matter of law under section 1983 because the Dobys had shown a custom or

12

policy of causing constitutional violations. However, it allowed the Dobys to proceed with some of their claims against DeCrescenzo and the police defendants.

Specifically, the court refused to dismiss the defamation, invasion of privacy, false arrest or imprisonment, gross negligence, and intentional infliction of emotional distress claims against DeCrescenzo. The court also allowed the Dobys to proceed against the police defendants on their section 1983 claims based on excessive force and against the individual police officers on claims of gross negligence and intentional infliction of emotional distress. The Dobys appeal from this September 9, 1996 order, insofar as it was unfavorable to them.

The remaining claims were tried on liability to a jury starting on January 21, 1998. At the close of the Dobys' case, the district court, by Judge Fullam, granted the police defendants a judgment as a matter of law. Thus, the jury deliberated only on certain claims against DeCrescenzo and ultimately returned a verdict on special interrogatories finding him liable for simple negligence but finding in his favor on all other counts. The jury, however, did not make a damages award. DeCrescenzo immediately moved for a judgment as a matter of law, and the court granted his motion, ruling that the evidence did not support the simple negligence verdict. The Dobys timely filed post-trial motions requesting reconsideration of certain earlier orders, amendment of the verdict, and a new trial, but the district court denied the motions in a memorandum and order on March 10, 1998. The Dobys appeal from this order as well.

IV. DISCUSSION

A. Did the District Court Err in Granting Summary Judgment to the Municipal Defendants on the Dobys' Official Capacity Claims?

Despite the Dobys' wide-ranging claims in their complaint, their appeal focuses on six of the district court's rulings. The first ruling that the Dobys contest is the grant of summary judgment to LVF and the county on the official capacity claims. The first three issues briefed by the Dobys

13

revolve around this ruling.3 Thus, the initial question before us is whether the district court erred in concluding that LVF and the county were not liable to the Dobys because they had no established custom or policy that caused a constitutional deprivation. Because this first issue requires us to review the grant of summary judgment, our review is plenary and we must draw all reasonable factual inferences in favor of the Dobys, the non-moving party. See Sharrar v. Felsing, 128 F.3d 810, 817 (3d Cir. 1997).

### 1. The existence of a municipal custom or policy

The district court correctly ruled that the Dobys could recover under section 1983 on their official capacity claims against the county defendants only if they showed that the defendants had maintained a policy or custom that caused a deprivation of constitutional rights. See, e.g., Monell v. Department of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38 (1978). The Dobys argue that the county defendants did have a custom or policy and that this policy was unconstitutional. Specifically, they argue (i) that allowing any individual, rather than only mental health

---

3. The Dobys repeatedly rely on Pennsylvania courts' interpretations of Pennsylvania's constitutional provisions in making their argument that Doby's constitutional rights were violated. However, we must determine the liability of the county defendants under section 1983 according to federal law. See Baker v. McCollan, 443 U.S. 137, 142, 99 S.Ct. 2689, 2693 (1979). Moreover, the district court dismissed all the state law claims against LVF and the county based on their immunity from such claims under section 7114(a) of the MHPA, Pa. Stat. Ann. tit. 50, S 7114, and the Dobys have not appealed this ruling. Thus, the only valid issue for appeal raised by the first three sections of the Dobys' brief is whether
the county and LVF had a custom or policy of enforcing the MHPA in a manner that caused Doby to suffer a violation of her federal constitutional rights to due process and freedom from unreasonable seizures.

The Dobys may be arguing that the MHPA itself creates substantive rights that cannot be withdrawn without violating federal constitutional guarantees. The only such right that is briefed substantially, however, is the right to have only physicians or other mental health professionals petition for section 7302 warrants. As discussed below, we do not believe that the MHPA creates this right because we disagree with the Dobys' statutory interpretation.

14

professionals, to petition for an involuntary examination is unconstitutional; (ii) that warrants for involuntary examinations must be based on probable cause, which requires reliable informants, independent investigation, neutral and detached decision makers, and a warrant that is signed and sealed.

The district court dismissed the official capacity claims against LVF and the county because it concluded that the Dobys' allegation of a single act of constitutional violation, Doby's involuntary examination, could not constitute a custom or policy. We are of the view that this ruling misapplied Monell. In concluding that the Dobys had failed to allege a custom or policy because they claimed only a single violation, the district court stated that a custom or policy is found only when a "municipality must have known, or reasonably should have realized, from the nature of its conduct or from actual past violation, that its practices were causing or likely to cause violations of constitutional rights, and permitted these practices to occur." In constructing this definition, the court relied on Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990). In Bielevicz, however, the city had no express policy on the pertinent issue and the plaintiff therefore was attempting to prove that one official's misconduct was not an isolated occurrence. See id. In contrast, it cannot be doubted that the county and LVF maintained a custom or policy concerning applications for involuntary examinations.

LVF's written "Involuntary Commitment Procedure" expressly foresees accepting petitions from non-physicians and obtaining approval for the warrant from the county by telephone. Moreover, it instructs the crisis worker to "document" the behavior witnessed by the petitioner without making any mention of investigation. The defendants have not disputed that this is in fact how the county and LVF process petitions for involuntary examinations. When a plaintiff is challenging the constitutionality of a policy or custom itself, Bielevicz does not require him or her to allege a sequence of constitutional deprivations; the claim that the policy resulted in the plaintiff suffering such a deprivation satisfies Monell. See id. at 850-51. The district court therefore erred in

15

dismissing the Dobys' official capacity claims on the ground that they had failed to allege a custom or policy.

The question remains, however, whether the defendants' method of processing petitions truly can be considered a county, rather than a state, policy because when a county is merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the Monell line of cases. See Surplus Store and Exch., Inc. v. City of Delphi, 928 F.2d 788, 790-92 (7th Cir. 1991); cf. Garner v. Memphis Police Dep't, 8 F.3d 358, 364-66 (6th Cir. 1993) (stating that municipality would be held liable under Monell where state law authorized police officers to use deadly force to apprehend fleeing felons but municipality adopted a policy explaining when such force could be used). We seem not to have considered specifically whether municipalities or counties can be liable for enforcing state law, but in one decision we did approve a suit against a county where county sheriffs had garnished the plaintiffs' bank accounts based on a state statute. See Finberg v. Sullivan, 634 F.2d 50, 53-55 (3d Cir. 1980). We did not decide Finberg under Monell, however, because there the plaintiffs were seeking only a declaratory judgment that the state statute was unconstitutional. See id. at 53.

Without addressing the county/state policy distinction specifically, the Dobys clearly have framed their arguments to focus on the actions of the county. They do not argue that section 7302 as written is itself unconstitutional; rather they claim that LVF and the county have enforced it in an unconstitutional manner by permitting warrants to be issued by telephone based on uncorroborated information supplied by individuals who are not mental health professionals. The Dobys' suggestion that the enforcement procedures should be considered a municipal or county, rather than a state, policy has merit; because the statute itself does not specify how the county delegate is to receive information and issue warrants, LVF and the county presumably have some discretion in deciding how to implement the warrant application procedure. The Garner court found the existence of such discretion determinative in deciding that a municipality could be held liable for

enforcing the use of deadly force by its police officers. Ultimately, however, we believe that we need not decide whether a county or state policy is at issue because we conclude that the enforcement policy adopted by LVF and the county is constitutional.

> 2. Does the county's policy violate the Fourteenth Amendment's Due Process Clause and the Fourth Amendment?

The Dobys do not contend that it is unconstitutional for the Commonwealth of Pennsylvania to permit the involuntary examination of those individuals who appear to pose an immediate danger to themselves or others. Indeed, they repeatedly commend the State for drafting a statute that balances the need to provide treatment to the seriously ill against the civil rights of those in need of such treatment. The Dobys quarrel only with the enforcement of the statute in two respects: (i) that LVF and the county accept petitions for warrants from any individual, rather than only from mental health professionals; (ii) that the county delegate who decides whether to issue the warrant does not interview the petitioner personally, performs no investigation of the petitioner's claims, and permits the crisis worker to sign the warrant on his or her behalf. The district court relied on a well-analyzed and thoughtful decision of the Court of Appeals for the First Circuit in ruling that this enforcement policy is constitutional. See McCabe v. Life-Line Ambulance Serv. Inc., 77 F.3d 540 (1st Cir. 1996).

We deal first with a statutory interpretation contention the Dobys raise. They devote a considerable portion of their brief to arguing that statutory interpretation principles require us to interpret the phrase "physician or other responsible party" in section 7302(a)(1) to mean physician or other mental health professional. The decisive factor weighing against their interpretation is that it contradicts the relevant state agency's construction. The application form for requesting a warrant for a section 7302 examination does not limit the class of petitioners to mental health professionals like physicians; it states: "Part I must be completed by the person who believes the patient is in

17

need of treatment. If this person is not a physician, police officer, the County Administrator or his delegate . . . ." This form is created by the state agency in charge of overseeing the implementation of the MHPA. Pennsylvania cases provide that courts must defer to an administrative agency's interpretation of a statute unless that interpretation is clearly erroneous. See, e.g., Frey v. State Farm Mut. Auto. Ins. Co., 632 A.2d 930, 933 (Pa. Super. 1993). Given the Legislature's use of the phrase "other responsible party" rather than a phrase like "other health care professional," the agency's interpretation of the statute is not clearly erroneous and therefore merits our deference.

The Dobys' first constitutional argument is that permitting individuals other than mental health professionals to petition for a section 7302 warrant violates the Due Process Clause of the Fourteenth Amendment. They contend that permitting "anyone" to petition for such a warrant, particularly when the petitioner's statements are not investigated independently, will lead to arbitrary deprivations of liberty as the petitioner may have improper motives for seeking the involuntary examination. In circumstances where anyone can petition for a warrant, they argue, an individual must be granted the right to notice and a hearing before an involuntary examination is conducted.

It is important to note the narrowness of the Dobys' arguments: they do not doubt that Pennsylvania has a legitimate interest in providing for the involuntary examination of dangerous individuals and that the federal constitution does not prohibit it from legislating procedures to enforce this interest. A contrary argument would be difficult to support as the Supreme Court has held that a state, in conformity with the Due Process Clause, may confine mentally ill individuals if it shows by clear and convincing evidence that the individuals are ill and dangerous to themselves or others. See Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 1786 (1992) (citations omitted). The Dobys argue, however, that permitting non-physicians to apply for such warrants converts a constitutional process into an unconstitutional one. This argument does not withstand scrutiny.

18

As is made clear by the title of section 7302 of the MHPA, the procedure was created to allow the counties to handle emergency situations. Courts have stated repeatedly that due process is a flexible notion and that what kind of process is due depends on the individual and state interests at stake. See, e.g., Zinermon v. Bush, 494 U.S. 113, 127, 110 S.Ct. 975, 984 (1980). It may be reasonable, therefore, for a state to omit a provision for notice and a hearing in a statute created to deal with emergencies, particularly where the deprivation at issue, in this case detention for a maximum of several hours to permit an examination, continues for only a short period of time. See Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 19, 98 S.Ct. 1554, 1565 (1978) (stating that "[o]n occasion, this Court has recognized that where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional `advance procedural safeguards' ").

Indeed, the Dobys recognize the State's need to act quickly in emergencies but nevertheless claim that notice and a hearing must be provided in cases where the petitioner is not a physician because the information provided by non-physicians is unreliable. The Dobys have not demonstrated, however, that non-physicians as a class are inherently unreliable fact informants. Furthermore, the Dobys misapprehend the role of a petitioner by suggesting that a physician is more competent than a non-physician to decide when conduct is "dangerous." Although their contention may be true, under the structure of section 7302, the petitioners themselves are not making clinical determinations about an individual's mental state; instead, it is the county delegate, a trained mental health professional, who has the duty to decide whether the information provided by the petitioner constitutes grounds for issuing a warrant. The Dobys offer no convincing reason why non-physicians cannot be trusted to relay information to a person competent to judge such information under the appropriate clinical standards. Moreover, it is likely that a person other than a physician or a mental health professional will have the material information.

19

Additionally, section 7302 specifies that the county should make decisions based on information provided by a physician or "other responsible party." In the district court the county presented testimony that each warrant application is handled as it arises in order to guard against individuals "who appear impaired in some way." The Dobys have not proffered any evidence to suggest that LVF and the county have a practice of issuing warrants when a petitioner seems clearly imbalanced or otherwise impaired.

Further, the application procedure itself has a built-in safeguard to prevent ill-motivated individuals from seeking the involuntary examination of others: the face of the application includes a clear statement providing that anyone who supplies false information to the county may be prosecuted criminally. In conformity with that policy, Bryant informed DeCrescenzo that providing false information on the application would constitute a misdemeanor. Again, the Dobys have failed to explain why it is unconstitutional to permit responsible individuals to report about the actions of others when a mental health professional is entrusted with judging the import of such reports. Thus, the Dobys' claim that permitting non-physicians to apply for warrants transforms a procedure that is sound under the Due Process Clause to one that is unsound is unpersuasive.[4]

_____

4. The Dobys also appear to claim substantive due process violations. "A substantive due process violation is established if the government's actions were not rationally related to a legitimate government interest or were in fact motivated by bias, bad faith or improper motive." Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998) (citations omitted). Our conclusion below that the MHPA authorizes seizures that are "reasonable" under the Fourth Amendment establishes that the MHPA meets the rationality test imposed by substantive due process analysis. Furthermore, there is no basis in the record to conclude that the LVF or county defendants' actions were not rationally related to a legitimate government interest or were motivated by bias, bad faith, or improper motive. Indeed, the jury answered special interrogatories finding in favor of DeCrescenzo himself on the Dobys' claims of defamation, invasion of privacy, false arrest and detention, gross negligence/willful misconduct, and intentional infliction of emotional distress. In the circumstances it is quite clear that DeCrescenzo was pursuing a legitimate interest in this matter.

The Dobys' second constitutional arguments, which they base on the Fourth Amendment, are equally unconvincing, and thus the district court correctly dismissed them based on the "special need" exception to the probable cause and warrant requirements. The Dobys claim that warrants for involuntary examinations must be based on probable cause, and therefore contend that the county must conform to the requirements imposed by criminal law before it authorizes the police to take custody of a mentally ill individual for an involuntary examination.5

The Fourth Amendment applies to seizures in civil, as well as criminal, proceedings. See O'Connor v. Ortega, 480 U.S. 709, 714–15, 107 S.Ct. 1492, 1496 (1987). The fundamental inquiry in such proceedings, however, remains whether the government's conduct is reasonable under the circumstances. See Cady v. Dombrowski, 413 U.S. 433, 439–40, 93 S.Ct. 2523, 2527 (1973).

Although it was discussing a search rather than a seizure, the Supreme Court has held that states may act without obtaining a warrant and without probable cause in situations where "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168 (1987) (citations omitted). Construing Griffin, the Court of Appeals for the First Circuit held that the temporary involuntary commitment of those deemed dangerous to themselves or others qualifies as a "special need" permitting the state to act without a warrant. See McCabe, 77 F.3d at 549. We agree.

Requiring the county to seek a warrant from a magistrate in a situation where the county delegate has determined that there are reasonable grounds to believe in an

_____

5. The Dobys have not explained how their Fourth Amendment challenge implicates a municipal or county, rather than a state, policy. The MHPA clearly permits seizures of mentally ill individuals without requiring county officials to apply to a magistrate for a warrant that would be issued only upon probable cause. Instead, the statute creates an alternative warrant scheme. We continue to assume, however, for purposes of this opinion, that the county and LVF's actions in enforcing this statute could be deemed a county policy.

individual's "clear and present" dangerousness would entail delays with potentially life-threatening consequences. As discussed above, by its terms, section 7302 applies only in emergencies. Such emergency cases present a situation where seeking a warrant is systemically impracticable.

Moreover, as the Supreme Court suggested in Griffin, a magistrate's authorization is less desirable in cases where non-judicial expertise is involved, such as determining the amount of supervision necessary for a probationer. See Griffin, 483 U.S. at 876, 879 n.6, 107 S.Ct. at 3170, 3172 n.6. The same reasoning applies where a county delegate trained in a mental health field, rather than a magistrate judge trained in the law, renders the decision of whether an individual requires an emergency involuntary examination. Although the Dobys suggest that such a determination is unreliable when made by a county delegate on the telephone without a face-to-face interview with the petitioner, this argument again ignores the emergency nature of section 7302 warrants. Furthermore, this argument ignores the fact that magistrate judges often issue warrants based on information supplied by police officers who themselves are relying on absent informants.

Although we find that the "special need" exception applies to the county's conduct under the MHPA, we nevertheless must examine whether the procedures followed by the county are reasonable under the circumstances. Fourth Amendment doctrine provides that "the shorter the detention, the less compelling is the evidence of the necessity for it that the authorities need to produce." Villanova v. Abrams, 972 F.2d 792, 796 (7th Cir. 1992) (citations omitted). Because the Dobys contest the issuance of the section 7302 warrant, it is important to focus on the deprivation of liberty caused by the execution of the warrant itself. The MHPA requires that a physician examine a detained individual within two hours of his or her arrival at a hospital; therefore, that individual's liberty will be curtailed for at most several hours unless a physician independently concludes that the individual is mentally disabled and in need of involuntary treatment. See Pa. Stat. Ann. tit. 50, S 7302(b). Given the brief detention authorized, the warrant procedures provide important

22

safeguards to protect individuals' rights. First, the warrant is authorized by a neutral and detached official, the county delegate. See Pa. Stat. Ann. tit. 50, S 7302(a)(1); see McCabe, 77 F.3d at 552 (interpreting Supreme Court precedent to require neutral and detached decision-maker to authorize search or seizure in special needs exceptions to the warrant and probable cause requirement). Second, the county issues a warrant only when information presented by a "responsible party" convinces a trained county delegate that reasonable grounds exist to belief that an individual poses a clear and present danger to him/herself or others. Id.; Pa. Stat. Ann. tit. 50,S 7301(a).

Because the section 7302 procedures exist to respond to emergency cases, it is reasonable for the county delegate to consult with the crisis workers over the telephone and to issue such warrants without independent investigation. The statutory requirement that the individual appear "responsible" and the warning on the application form that false statements can subject a petitioner to criminal prosecution are sufficient safeguards in light of the circumstances to assure the reliability of information communicated to the delegate. We therefore reject the Dobys' Fourth Amendment challenge.6

B. Did the District Court Err in Granting a Judgment as a Matter of Law to DeCrescenzo on the Negligence Issue?

The jury returned a verdict in DeCrescenzo's favor on all claims, including gross negligence/willful misconduct, except simple negligence. The district court, however, granted a judgment as a matter of law on the negligence

_____

6. Once again, the Dobys rely on Pennsylvania law in their section 1983 argument, suggesting that the Pennsylvania Supreme Court has rejected the "special need" exception for state statutes authorizing a seizure. See Commonwealth v. Kohl, 615 A.2d 308 (Pa. 1992). Even if the court's ruling in Kohl could be relevant to the federal analysis under section 1983, the Dobys misinterpret Kohl. This decision does not purport to renounce categorically the "special need" exception; instead it simply states that, under federal law, the exception does not apply in cases where "the governmental interest to be advanced is the normal need for law enforcement." Kohl, 615 A.2d at 314.

claim primarily because it concluded that there was simply no evidence to support the verdict. It also found, however, that the Dobys had not shown proximate cause between the alleged negligence and Doby's injury. Subsequently on the Dobys' post-trial motions it ruled that DeCrescenzo was immune from a claim of simple negligence under section 7114 of the MHPA.

We will affirm the district court's ruling on this because we agree with Judge Fullam's conclusion that DeCrescenzo qualifies for immunity under section 7114. This section provides in relevant part that:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act . . . shall not be civilly or criminally liable for such decision or for any of its consequences.

Pa. Stat. Ann. tit. 50, S 7114(a). Because DeCrescenzo was the responsible person who initiated the involuntary examination proceedings under section 7302, we hold that he qualifies as an "authorized person who participate[d] in a decision that a person be examined." See id.

Judge Rendell concluded otherwise in her summary judgment order because she interpreted McNamara v. Schleifer Ambulance Serv., Inc., 556 A.2d 448 (Pa. Super. 1989) to limit "participa[nts] in a decision" to those with mental health training. We recognize that McNamara contains language suggesting that section 7114 only applies to mental health professionals. See McNamara, 556 A.2d at 449-50 (stating that "the legislature contemplated the decision-making process under S 7114 as one which would take place within the context of treatment, care, diagnosis or rehabilitation. It is equally clear that the individuals who would participate in those decisions would be trained in the field of mental health."). But the issue in McNamara was whether ambulance drivers transporting a mental health patient qualified for immunity under the MHPA. See id. at 449. Thus, the implicit question addressed in that case was what kind of medical personnel

24

would qualify for immunity. The Pennsylvania Superior Court reasonably concluded that only individuals with mental health training, and thus those that actually had participated in the assessment of the patient's mental state, qualified for immunity.

In contrast, the issue posed by this appeal is whether the individual who applies for a section 7302 warrant can be deemed to be a participant in the decision-making process to involuntarily examine the patient. We believe the answer to this question must be "yes" because section 7114 explicitly includes peace officers within its immunity provision. See Pa. Stat. Ann. tit. 50, S 7114. Given the statutory scheme, it is difficult to imagine what role peace officers could play in a decision to examine or treat an individual other than to report information of dangerous conduct observed by them. Because this is precisely what DeCrescenzo did in this case, we find that he, like a peace officer, qualifies for immunity under section 7114 unless he engaged in willful misconduct or gross negligence. The district court, therefore, correctly granted judgment as a matter of law to DeCrescenzo on the simple negligence claim.7

C. Did the District Court Err in Entering a Judgment as a Matter of Law for the Police Defendants on the Claims of Excessive Force?

In considering the judgment as a matter of law for the police defendants our review is plenary. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). In conducting our review, we apply the same standard relied upon by the district court. See id. This standard requires us to consider the evidence in the light most favorable to the nonmoving party and to deny a defendant's motion for a judgment as a matter of law if there is evidence reasonably supporting recovery by the plaintiffs.

At the close of the Dobys' case, the district court granted

_____

7. We also agree with the district court that the evidence could not support a verdict on a negligence theory in favor of the Dobys against DeCrescenzo. The district court also concluded that the Dobys' pleadings did not include a claim for simple negligence so that the verdict for that reason as well could not stand. We do not reach that issue.

a judgment as a matter of law to the police defendants on the excessive force claims because it ruled that no rational jury could find in the Dobys' favor on these claims. The court explained: "[b]y the plaintiff's own testimony, she was not mistreated. Under plaintiff's own testimony, she did kick and scream. So that I don't think any rational jury could say it was unreasonable for them to subdue her and then to get her to the hospital."

In analyzing claims of excessive force under the Fourth Amendment, we must decide whether the actions of the police were "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872 (1989) (internal quotation marks omitted). See also In re City of Philadelphia Litig., 49 F.3d 945, 962–63 (3d Cir. 1995). Significant factors in evaluating the force used by the police are whether the person being taken into custody is resisting or attempting to resist by flight. See Graham, 490 U.S. at 396, 109 S.Ct. at 1871–72.

As the police officers argue, when they came to take Doby into custody they had to be prepared to handle an individual that the county delegate had determined posed a clear danger to herself or others. Further, the officers were aware that there were guns in the Dobys' home. Given these circumstances, Doby's own testimony establishes that the officers' actions were reasonable.

Upon arrival at the Dobys' residence, the officers knocked on the door and requested that Doby step outside of the apartment. When the officers refused to tell her why she was being taken into custody, Doby made clear that she would not accompany them willingly and "became angry." She then attempted to return to the apartment, thus resisting, causing the officers to "grab" her. When she began to kick at the door and scream, the officers handcuffed her. When she continued to kick and scream, the officers shackled her. Once Doby arrived at the hospital, a female officer performed a pat-down search and Doby was placed in a wheelchair. Her handcuffs and shackles were removed once she promised to cooperate.

26

Doby's own testimony established that the police officers applied force in response to her attempts to resist, including kicking, screaming and flight. Moreover, they tailored each action taken to the type of resistance encountered: handcuffing to prevent flight, shackling to prevent kicking. We therefore conclude that the officers' actions were objectively reasonable as a matter of law and will affirm the district court's order on the excessive force claims.[8]

D. Did the District Court Err in Denying the Dobys'
        Request for a Declaratory Judgment?

The district court, by Judge Fullam, rejected the Dobys' motion for a judgment declaring the MHPA to be unconstitutional under the Fourteenth Amendment's Due Process Clause and the Fourth Amendment. It ruled that the Dobys had abandoned this claim by failing to renew it before the trial and that, as a result, the court had not provided the Attorney General of Pennsylvania with the notice required under Fed. R. Civ. P. 24(c). We need not reach the issue of proper notice in order to affirm the district court's decision. As explained above, the statute is constitutional under the Due Process Clause and the Fourth Amendment even if non-physicians are allowed to petition for section 7302 warrants. Thus, the district court's refusal to rule on the declaratory judgment motion, even if it had been error, was harmless.

E. Did the District Court Abuse Its Discretion in
        Prohibiting Dobys' Expert Susan Bierker From
        Testifying?

We review the district court's rulings on the admissibility of expert testimony for abuse of discretion. See United

_____

8. The Dobys' claim that section 4422 of the Pennsylvania mental health statutes rendered the officers' actions illegal is meritless. See Pa. Stat.
Ann. tit. 50, S 4422 (West 1969). Section 4422 provides that "[m]echanical restraints shall not be used or applied to a mentally disabled person, except: (1) When necessary to prevent such person from harming himself or others when being transported as provided in sections 405 or 421 . . . ." As discussed above, the restraints used by the
police officers were necessary to prevent Doby from harming the officers or herself as a result of her resistance.

27

States v. Bennett, 161 F.3d 171, 182 (3d Cir. 1998); Waldorf v. Shuta, 142 F.3d 601, 626-27 (3d Cir. 1998). The trial judge has broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trier of fact. See Bennett, 161 F.3d at 182.

The district court, by Judge Fullam, excluded the testimony of Susan Bierker, a licensed clinical social worker who was prepared to opine that Doby had suffered post-traumatic stress disorder solely as a result of herfive-day involuntary commitment. The court concluded that Bierker was not qualified to render this opinion and that her opinion was based on a "seriously inaccurate" understanding of the facts. The Dobys claim that this was error.

As the Dobys concede, Bierker's testimony was offered to prove the damages suffered by Doby. Because the jury returned a verdict in favor of DeCrescenzo on all claims other than simple negligence, and because the court correctly granted a judgment as a matter of law to DeCrescenzo on the simple negligence claim, there were no damages for the jury to calculate. Thus, any error by the district court in excluding Bierker's testimony is harmless.

F. Did the District Court Err in Granting Summary
       Judgment to Dr. Richards?

The district court, by Judge Rendell, found that, because Dr. Richards qualified for immunity under section 7114 of the MHPA, he could be liable to the Dobys only if his conduct amounted to gross negligence or willful misconduct. The court ruled, as a matter of law, that the Dobys had not provided evidence sufficient to "establish flagrant behavior which grossly deviates from the standard of care required."

The claim against Dr. Richards, of course, essentially related to his decision to commit Doby involuntarily rather than to the issuance of the warrant. The Dobys do not contest the district court's decision that, as a treating physician, Dr. Richards would be liable to them only for gross negligence/willful misconduct. Pennsylvania law defines gross negligence in the context of the MHPA as "facts indicating more egregiously deviant conduct than

28

ordinary carelessness, inadvertence, laxity or indifference. . . . The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." Albright v. Abington Memorial Hospital, 696 A.2d 1159, 1164 (Pa. 1997) (citation omitted). Further, willful misconduct exists when "the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong." Krivijanski v. Union R.R. Co., 515 A.2d 933, 937 (Pa. Super. 1986) (internal quotation marks omitted).

The Dobys produced two expert reports, one from Dr. Paul S. Applebaum and the other from Dr. Eileen A. Bazelon, to support their contention that Dr. Richards had acted in a grossly negligent manner. Dr. Bazelon's report states: "Dr. Richards [did not act] in accordance with the customary or usual standard of care." She opines that by not questioning DeCrescenzo's motive or further questioning Herbert Doby and Doby's regular psychiatrist, Dr. Richards "deviated from the reasonable standard of care" and evidenced "complete disregard" for Doby's rights. Her report also acknowledges, however, that the content of Doby's writings was "frightening."

This first report does not create a genuine factual dispute about Dr. Richards' gross negligence/willful misconduct. Dr. Bazelon merely states that Dr. Richards deviated from the standard of care, which might amount to ordinary negligence, but she does not use terms to suggest that this deviation was gross or flagrant.

The second report, by Dr. Applebaum, details five deficiencies with Dr. Richards' examination and resulting diagnosis of Doby's depression, including failure to inquire about the most common symptoms of depression, failure to evaluate adequately her suicidality, failure to access collateral sources of data such as Doby's regular psychiatrist and Herbert Doby, a "grossly inadequate" mental status evaluation, and failure to explore less restrictive alternatives to involuntary commitment. The language of this report does suggest that Dr. Richards acted with gross negligence; Dr. Applebaum presents Dr. Richards as a highly incompetent psychiatrist, unfamiliar

29

with the basic medical definition of depression or its common symptoms and indifferent to the information he did gather. However, Dr. Applebaum's failure to discuss in any way the contents of the 11-page letter and the suicide note suggests a lack of familiarity with the basic facts of the case. See Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1142 (3d Cir. 1990) (stating that expert opinion in the circumstance of that case should have been based on facts in the record). This apparent ignorance of Doby's writings, which represented crucial evidence of her mental state, undermines Dr. Applebaum's conclusions regarding Dr. Richards' actions.

Considering the undisputed facts of this case, which showed that Doby had a history of depression and admitted to contemplating suicide, and that Dr. Richards had in his possession an extensive 11-page letter that even the Dobys' expert Dr. Bazelon concedes was "frightening," we agree with the district court's ruling "that the deficiencies noted by Drs. Applebaum and Bazelon could not amount to anything more than simple negligence by Dr. Richards." We also point out that courts should be cautious in allowing juries to deliberate on the liability of physicians making involuntary committments lest physicians decline to order committments when needed, thus possibly leading to unfortunate consequences. Cf. McArdle v. Tronetti, 961 F.2d 1083, 1085-86 (3d Cir. 1992) (prison doctor allegedly giving false testimony and false diagnosis in commitment proceedings entitled to absolute immunity in action under 42 U.S.C. S 1983 in furtherance of policy to protect person functioning as part of judicial process from harassment and intimidation).

V. CONCLUSION

We will affirm both the district court's September 9, 1996 order granting summary judgment to the defendants on a portion of the Dobys' claims and its March 10, 1998 order denying the Dobys' motion requesting a new trial, reconsideration of previous orders, and amendment of the judgment.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit